COMMONWEALTH & DOMINION LINE, Limited, v. SEABOARD TRANSP. CO.

(District Court, D. Massachusetts. September 30, 1921.)

No. 1674.

Collision ⬥95 (2)—Privileged vessel not in fault for keeping her course and speed.

A steamer *held* not chargeable with contributory fault for a collision at night, caused by the gross fault of a meeting tug with a long tow, which, though the steamer was the privileged vessel, turned to port across her course, where the steamer kept her course and speed, and had no reason to suppose the tug would not pass port to port, as required by the rules, until so close that collision was imminent, and any error on her part thereafter was excusable.

On rehearing. Prior decree modified.
For prior opinion, see 258 Fed. 707.

Putnam, Putnam & Bell, of Boston, Mass., and Lord, Day & Lord, of New York City, for libelant.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for respondent.

FitzHenry Smith, Jr., of Boston, Mass., for Republique Française.

MORTON, District Judge. In view of the intervention of the United States and the French Republic, as owners of the cargo in the Port Hunter, this case has been fully reheard upon the question whether the Port Hunter was at fault. As between the steamer and the tug, that issue was practically unimportant, because, if the tug were held at fault, the loss was so great that one-half the damages would more than wipe out her entire value, and it consequently was not much considered, either by counsel or by the court at the former hearing. Neither the interveners nor the steamer now urge that the description in the former opinion of the accident and of the courses taken by the colliding vessels is erroneous; the facts are assumed to be as therein stated. But the Port Hunter contends that upon those facts the finding that she was at fault was unjustified.

I have given this question the most careful reconsideration. Against the steamer it is urged that, with plenty of room on her left between the tow and the land, she changed course twice to starboard as she came up the Sound towards the tow; that she did not signal her intention to go to starboard until after the tug had signaled that she was going to port; and that, not being able to see the tug's side lights, and therefore in doubt as to the tug's direction, the Port Hunter maintained full speed on a course which was taking her so close to the other vessel that the unexpected movement of the latter to port created a situation from which there was no escape, or which demanded that the engines of the steamer should be promptly reversed.

In behalf of the steamer it is argued that under the facts as found the tug was either meeting the steamer end on, in which case it was the tug's plain duty to turn to starboard, or she was holding a course involving risk of collision, across the steamer's bow from port to starboard, in which case she was the burdened vessel, and it was her duty to keep out of the steamer's way; that in addition to this, if the Sound be regarded as a narrow channel, the tug was far over on her wrong side of it, and yet did not give way to a vessel rightly proceeding on that side, but brought about the disaster by turning to port when the vessels were close together; that the steamer, in swinging to starboard as she went up the Sound, performed her statutory duty in meeting end on or in a narrow channel; that, while she did not make out the tug's side lights, she knew she was approaching a tug and tow, and also knew that under every rule the tug was required to turn to starboard; that she had no reason to anticipate that the tug would not give way, and would make a surprising and inexcusable movement as she did in turning to port; and that, in the great and sudden emergency created by that negligence of the tug, the steamer did as well as could reasonably be demanded.

At the time when the tug gave her two-blast signal and turned to port, she probably had both side lights of the steamer in view. She herself was either head on to the steamer or was showing the steamer her starboard light. Trailing behind her, sagging off to her starboard, was her tow, which for a distance of about 2,000 feet obstructed navigation. In that situation, for the tug to turn to her left, and keep on with her tow across the other vessel's bow, was conduct for which "gross negligence" is a mild characterization. It was certainly nothing which ought to have been anticipated by the other vessel.

It seems clear that the steamer held her course and speed towards the tow because her pilot knew that he had the right of way and supposed the tow would keep out of his way. When the green light was made out, and it was evident that the tug was heading across the steamer's path, the vessels were so close that there was danger of collision if the tug did not promptly turn to starboard. If she had done so, the vessels would have passed in safety.

In The Delaware, 161 U. S. 459, 469, 16 Sup. Ct. 516, 521 (40 L. Ed. 771), the court said (per Brown, J.):

> "The cases of The Britannia, 153 U. S. 130, and The Northfield, 154 U. S. 629, must be regarded * * * as settling the law that the preferred steamer will not be held in fault for maintaining her course and speed, so long as it is possible for the other to avoid her by porting, at least in the absence of some distinct indication that she is about to fail in her duty. * * * In the case under consideration there was really nothing to apprise the tug that the Delaware would not port and go under her stern, until the collision became inevitable."

The rule thus laid down has been frequently applied to situations similar to that presented in the case at bar. See The Binghampton, 271 Fed. 69 (C. C. A. 2d); The Hokendauqua (D. C.) 270 Fed. 270, 272. Moreover, the tug's fault was so gross, and the steamer's fault— if she were at fault—so slight in comparison, that I think the latter should be given the benefit of the principle (applied in The Hokendauqua, supra) that, where one vessel is grossly at fault and the fault of the other is doubtful, and at most slight:

> "It is not necessary, and indeed is not permitted, to the court to search for minute possible faults on the part of one vessel, when the great and fundamental faults are plainly to be laid at the door of the other." Hough, J., in The Hokendauqua, supra.

As soon as the tug's green light was made out and her two blasts heard on the steamer, the situation was recognized as a critical emergency and a case of special circumstances under the rules. It is wholly problematical how she would have come out if she had been differently handled in it. Considering the wide latitude of action allowed under such circumstances, it cannot be said that her officers were negligent.

The decisions to which I have referred were not called to my attention at the former hearing, and in view of them I think my finding that the Port Hunter was at fault cannot be sustained. The decree heretofore entered must be vacated, and there must be a new decree, adjudging the Covington solely at fault.